Simon Shapiro and Jeanette Shapiro v. Commissioner.
Shapiro v. Commissioner
Docket No. 4194-64.
United States Tax Court
T.C. Memo 1966-128; 1966 Tax Ct. Memo LEXIS 152; 25 T.C.M. (CCH) 654; T.C.M. (RIA) 66128; June 16, 1966
Hershel Zonderman, 19 Milk St., Boston, Mass., for the petitioners. *153 Robert B. Dugan, for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of the petitioners as follows: Year
Deficiency
1956
$4,386.46
1957
2,957.93
1958
83.20
1959
1,647.62
1960
80.61
1961
68.20
The only question for decision is whether losses sustained by Simon in 1959 from worthless stock and, in the alternative, from a bad debt caused an operating net loss which could be carried back to 1956 and 1957. The determination for the years 1958, 1960 and 1961 are not contested. Findings of Fact The petitioners, husband and wife, reside in Somerset, Massachusetts, and filed joint income tax returns for the tax years with the director of internal revenue for the Boston district. Simon is a textile engineer and has been in the textile business since 1934. Sometime prior to August 17, 1955, when he was looking for a new textile business, he met Burton Dickson who had experience in the corduroy industry and they decided to organize Watuppa Finishing Corporation to process corduroy for manufacturers of that material. Watuppa was incorporated under the laws of Massachusetts *154 on August 17, 1955. It issued 1000 shares of one dollar par value Class A voting common stock in 1955. It also had 4,000 shares of non-voting no par value Class B common stock but it did not issue that stock until June 13, 1959. The Class A stock was held at all times material hereto as follows: Simon 500 shares, Dickison 150 shares, Sidney Schenker, a CPA, 150 shares and Leo J. Sacks, Simon's stepson, 200 shares. The paid-in capital of $1,000 was inadequate and it was understood from the beginning that Simon would lend substantial additional operating funds which would be needed. He advanced to Watuppa more than $176,000 between 1955 and 1958, $146,300 of which was evidenced by unsecured notes of the company. Additional advancements by Simon and other stockholders were treated as capital contributions and increased their investments in the Class A stock. Simon also "loaned $40,000 to Watuppa secured by a personal property mortgage on certain assets of Watuppa." Watuppa borrowed $125,000 on June 17, 1958, from Fall River Trust Company on a secured loan backed by the Small Business Administration. All outstanding debts of Watuppa were subordinated to that loan. Simon and Dickison *155 rented a place for the Watuppa plant, bought and assembled machinery, employed about 100 workers, and had the workers complete the plant to process corduroy. The operators had to be specially trained to do the work. Simon made his substantial loans to Watuppa and after the plant was ready it started business. Simon spent six to eight hours a day in the plant as general manager and production chief. The processing done by Watuppa improved until, after several years, the company was receiving a substantial amount of corduroy to be processed. It was not able to cut all of the corduroy it was receiving and it needed more cutting machinery and other equipment. The director-stockholders decided at a meeting on June 13, 1959, to allow the corporation to issue its Class B stock to them in cancellation of the unsecured loans due them in order to improve its outside credit. The other Class A stockholders became convinced that Dickison, president of Watuppa, had engaged in improper and dishonest acts to the detriment of the corporation and at a meeting in July 1959 discharged Dickison as president. Shortly thereafter several key employees refused to continue because the corporation would *156 not reinstate Dickison. Replacements could not be obtained and bankruptcy proceedings were instituted by or against Watuppa in August 1959. It is stipulated that all of the outstanding Class A and Class B stock of Watuppa became worthless in 1959 and in that year Simon sustained a loss of $146,300 on account of the worthlessness of his Class B stock and a loss of $40,000 on account of the worthlessness of his secured loan to Watuppa. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The Commissioner, in determining the deficiency, disallowed the deduction taken as a section 1244 loss on Simon's Class B stock "because you have failed to establish that you are entitled to such a deduction." The petitioners have the burden of proof to show that they come within section 1244. It is not clear that the stockholder-directors of the company had section 1244 in mind or knew of its requirements but the steps which they took on June 13, 1959, were for the purpose of accomplishing, in a general way, the kind of result which Congress had in mind in enacting that relief section, and it is unfortunate that the petitioner cannot receive its intended *157 benefits. The plan adopted specified no time limit on the offer of Class B stock in exchange for the indebtedness, as required by section 1244(c)(1)(A). Section 1244(d)(1) provides that the basis of the stock received in exchange for property shall be the basis of the property reduced by the excess of that basis over the fair market value of that property immediately before the exchange. Fair market value is defined as the sales price between a willing buyer and a willing seller, neither under any compulsion to buy or sell and both having knowledge of the facts. No opinion evidence of the fair market value of Simon's notes immediately before their exchange for the Class B stock was offered. The financial condition of the company at that time, as indicated by balance sheets in evidence, supports the Commissioner's contention that those notes had no fair market value. Simon and perhaps other stockholders were still hopeful that the company would soon cease to operate at a loss and start to make good profits. However, there is no fair preponderance of evidence to show any fair market value for the notes at the time of the exchange and thus overcome the presumption of correctness attaching *158 to the determination of the Commissioner that the petitioner is not entitled to relief under section 1244. The petitioners claim, in the alternative, that they are entitled to a business bad debt deduction of $40,000 on a mortgage loan to Watuppa. See section 166(a)(1) and (d)(2)(A) and (B). Simon, a textile engineer, had been active in one company engaged in the textile field and became interested, when he met Dickison, in organizing another to engage in the processing of corduroy. The incorporation of Watuppa followed. It was understood that Simon would lend that corporation a large part of the money which it would need to get started. Machinery was purchased and operators of that machinery were trained. Manufacturers of corduroy were obtained as customers. Simon played an important part in those activities and loaned a large amount of money to Watuppa, including the $40,000 secured by a mortgage on assets owned by Watuppa. It is stipulated that this debt became worthless in 1959 and the question here is - what was Simon's business in which this was a business bad debt. His unsecured loans to Watuppa were not investments in the sense that he expected to profit directly from *159 them. Nor is it claimed that his loans were to protect his investment of $500 in Watuppa Class A stock. His ownership of the stock did not constitute a business. He was not promoting corporations generally or Watuppa particularly, in the hope of selling his interest therein at a profit. He was trying to develop a profitable business for Watuppa and, towards that goal, was lending it substantial sums of money to buy necessary equipment and train personnel to operate its processing plant, in the hope that it could soon obtain sufficient business from the manufacturers of corduroy to operate at a profit. His salary was not large and his gain would have to come through his ownership of stock. His efforts to develop the business of Watuppa occupied most of his time from August 1955 until late in 1959. The alleged business in which this loss occurred is stated in the petitioners' brief as follows: "Shapiro's employment by Watuppa, his active participation in the entire spectrum of Watuppa's activities, constituted Shapiro's business, and * * * the $40,000 in loans made to Watuppa were proximately related to his business of corporate employment and necessary to maintaining his job there. *160 " The $40,000 was not made in "loans" but was a single loan and different from his other loans in that it was "secured by a personal property mortgage on certain assets of Watuppa." The record does not show when it was made or for what purpose it was made. The petitioner does not cite any case involving facts similar to those here involving the $40,000 loan. The law on this general subject is not crystal clear. Cf. . The facts in that case are different from those here relating to the $40,000 loan. , does not aid this petitioner. Those cases and others indicate that the evidence must clearly show some actual business of the taxpayer in the ordinary course of which the debt was incurred if the debt is to be regarded as a business bad debt. The cases generally tend to support the Commissioner in this case and none has been found which gives much support to the petitioners. Decision will be entered for the respondent.